IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GEE AUTOMOTIVE Portland I, LLC, et al.,

        Plaintiffs,

v.

ECT BETT Investments TGH LLC, et al.,

        Defendants.

Case No. 3:23-cv-01134-AB

FINDINGS OF FACT & CONCLUSIONS OF LAW

**BAGGIO, District Judge:**

    This dispute arises out of two car dealership leases (the "Leases") between Plaintiffs Gee Automotive VII and Gee Automotive XIII and Defendants BET BETT Investments TGH LLC and ECT BETT Investments TGH LLC.[1] The Parties bring declaratory judgment claims and counterclaims asking the Court to interpret Section 13.2 of the Leases, which excludes "Leasehold Improvement Value" from the purchase price of the dealerships in the event either party exercises provisions of the Leases that force the sale of a dealership. Specifically, Plaintiffs ask the Court to (1) enter judgment in favor of Plaintiffs declaring what conditions at the

---

[1] Though BETT Investments LLC—the entity listed as the landlord on the Leases—is not a party to this case, Defendants clarified at trial that the Leases were assigned to Defendants BET BETT Investments TGH LLC and ECT BETT Investments TGH LLC.

1 – FINDINGS OF FACT & CONCLUSIONS OF LAW


dealerships are improvements or additions and excluded from the appraised value of the dealerships under Section 13.2; and (2) declare what instructions the third appraiser should be provided as to the meaning of "Leasehold Improvement Value."[2] Compl. ¶¶ 44–45, ECF No. 1. Defendants similarly seek a declaration as to the meaning of Section 13.2, asking the Court to find that all of Plaintiffs' claimed improvements, except for additional square footage, are replacements and not leasehold improvements. Answer ¶ 74, ECF No. 7.

The Court conducted a three-day bench trial on the Parties' declaratory judgment claims from December 6, 2024, to December 8, 2024, and the Parties filed Proposed Findings of Fact and Conclusions of Law and supplemental briefing on Oregon's parol evidence rule on December 13, 2024. What follows is the Court's Findings of Fact and Conclusions of Law from trial. *See* Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

1. The Parties in this case own and operate car dealerships. Plaintiffs' CEO, Ryan Gee, took over his father's dealerships and began growing their family business in 2003. Defendants are owned by the Tonkin family. Brad and Ed Tonkin (the "Tonkins") inherited the business from their father after decades of work in his dealerships.

2. In late 2015, the Tonkins decided to sell fourteen of their car dealerships. By early 2016, they had put together an offering book and had the properties appraised by a commercial real estate appraiser. Exs. 16, 18. The Tonkins met Gee in February 2016 and provided him with the book. Gee returned a letter of intent to purchase the car dealerships a few months later.

---

[2] In their closing argument, Plaintiffs argued that the Court should not instruct the appraiser as to the meaning of "Leasehold Improvement Value" or "replacements of existing components." This argument is inconsistent with Plaintiffs' declaratory judgment claim asking the Court to interpret the Leases, but the Court will address it in its conclusions below.

2 – FINDINGS OF FACT & CONCLUSIONS OF LAW

3. The original intent of the Parties was for Plaintiffs to acquire all the assets of the operating dealerships. But Plaintiffs ultimately only purchased thirteen of the Tonkin's businesses and assets. The Parties did not simultaneously sell Defendants' real estate holdings ("the Premises") to Plaintiffs. The Tonkins wanted to hold on to the real estate to avoid tax issues and to maintain a stream of rental income. Deferring the purchase of the real estate also benefitted Plaintiffs.

4. In lieu of purchasing the real property associated with the businesses, the Parties negotiated leases for each property. Exs. 4, 5, 501, 502, 504, 505. The Leases were primarily negotiated by Gee; Jeff Jackson, president of Gee Automotive; Erica Sampson, the Tonkin's Chief Financial Officer at the time;[3] and Jeffrey Keeney, the Tonkin's lawyer.

5. The Parties signed the Leases on May 1, 2017. Exs. 1, 2.

6. The lease term is fifteen years with the option to renew the Leases for two successive ten-year terms. Exs. 1, 2 at §§ 1.5, 2.3.

7. The Leases are triple net leases. Plaintiffs are responsible for all major charges pertaining to the Premises, including maintenance and repair, taxes, and insurance. Specifically, with regard to maintenance and repair, the Leases require Plaintiffs to:

> [K]eep all portions of the Premises (including structural, nonstructural, interior, exterior and landscaped areas, portions, systems and equipment) in good order, condition and repair (including repainting and refinishing as may be required by any manufacturer, or as needed in Tenant's commercially reasonable discretion). If any portion of the Premises or any system or equipment in the Premises that Tenant is obligated to repair cannot be fully repaired or restored, Tenant shall promptly replace such portion of the Premises or system or equipment in the Premises, regardless of whether the benefit of such replacement extends beyond the Lease Term. Tenant shall maintain a preventive maintenance contract providing for the regular inspection and maintenance of the heating and air conditioning system by a licensed heating and air conditioning contractor. If any part of the Premises is

---

[3] Sampson testified that she worked for the Tonkins until May 1, 2017, when the businesses were sold to Plaintiffs and she began working for Gee.

3 – FINDINGS OF FACT & CONCLUSIONS OF LAW

damaged by any act or omission of Tenant, Tenant shall repair the damaged portion of the Premises. It is the intention of Landlord and Tenant that at all times Tenant shall maintain the portions of the Premises that Tenant is obligated to maintain in an attractive, first-class and fully operative condition.

Exs. 1, 2 at § 6.4.

8. The Leases also require Defendants' consent for any alterations, additions, or improvements to the dealerships in excess of $50,000. Defendants, however, cannot unreasonably withhold, condition, or delay consent where the improvements are required by an auto manufacturer. Exs. 1, 2 at § 6.5.

9. Sections 13 and 14 of the Leases include "Put" and "Option" provisions that permit the sale of the leased property between years six and fifteen of the lease term. Exs. 1, 2. Beginning in year six, Defendants could "Put to Tenant" to require Plaintiffs to purchase up to three Premises of Defendants' choice in a twelve-month period. Exs. 1, 2 at § 13. If Defendants do not exercise this right, Plaintiffs can exercise their Option to purchase up to three Premises of their choosing in a twelve-month period. Exs. 1, 2 at § 14.

10. Section 13.2 of the Leases provides guidelines for calculating the Purchase Price of Premises selected by either Plaintiffs or Defendants. Specifically, it states:

> The price to be paid by Purchaser to Landlord for the Premises shall be the fair market value of the Premises as of the date of the exercise of the Put (the "Purchase Price"). The Purchase Price shall not include the value of any leasehold improvements or additions to the Premises constructed or installed by Tenant at its sole cost and expense (the "Leasehold Improvement Value"). The Leasehold Improvement Value shall not, however, include the cost or value of replacements of existing components of the Premises. If Landlord and Purchaser have not agreed to the Purchase Price within thirty (30) days after the date of exercise of the Put, Landlord and Purchaser will each appoint a real estate appraiser with at least five (5) years full-time commercial appraisal experience in the Portland Metropolitan Area to appraise the then fair-market value of the Premises. If the appraisals prepared by the two appraisers appointed by Landlord and Purchaser are within five percent (5%) of each other, then the Purchase Price will be established by the average of the two appraisals. If the two appraisals are more than five percent (5%) apart, the two

4 – FINDINGS OF FACT & CONCLUSIONS OF LAW

>appraisers will elect a third appraiser who meets the qualifications set forth above within ten (10) days after the submission of the two initial appraisals. The third appraiser shall not be permitted to review the appraisals prepared by Landlord's appraiser or Purchaser's appraiser until such time as the third appraiser has rendered his or her final decision. Within thirty (30) days after appointment, the third appraiser will submit his or her appraisal and the Purchase Price will be the average of the two appraisals which are closest in value. Landlord and Purchaser will each bear the cost of the appraiser selected by that party and one-half of the cost of the third appraisal.

Exs. 1, 2 at § 13.2.

11. Before the leases were signed, there were discussions between the Parties regarding the spirit of the Leases. Specifically, Sampson testified that she and Gee discussed that Plaintiffs did not want to pay for improvements twice if they later purchased a property from Defendants. The Parties did not otherwise discuss Section 13.2.

12. The Leases set minimum option prices for the Premises. Exs. 1, 2 at § 14.

13. Any dispute or claim arising out of the Leases, other than actions for unlawful detainer, that the Parties are unable to resolve after mediation shall be decided by the federal district court in Multnomah County, Oregon, or the state court in Clackamas County, Oregon. Exs. 1, 2 at §§ 17.2, 18.10.

14. Section 18.6 of the Leases provides: "This Lease is the only agreement between the parties pertaining to the lease of the Premises and no other agreements are effective. All amendments to this Lease shall be in writing and signed by all parties. Any other attempted amendment shall be void." Exs. 1, 2.

15. On May 16, 2022, Plaintiffs exercised their Option to purchase three leased premises: (1) Chrysler, Jeep, Dodge, Ram & Fiat-Gladstone ("CJDRF"); (2) Hyundai-Gladstone; and (3) Honda-Portland. Plaintiffs also communicated to the Tonkins their intent to purchase all of the properties over the next five years.

5 – FINDINGS OF FACT & CONCLUSIONS OF LAW

16. Plaintiffs have withdrawn their claim regarding Honda-Portland.

17. The Parties could not agree on a purchase price for CJDRF or Hyundai-Gladstone.

18. Car manufacturers regularly require facility upgrades, and the Parties were aware that updates were needed for both facilities at the time they negotiated the Leases. Ex. 506. The Tonkins had already engaged an architect for updates to the Hyundai-Gladstone property, and the manufacturer required updates to the CJDRF facility as a condition of its approval of Gee to operate the dealership.

19. Plaintiffs spent a significant sum of money on construction at CJDRF and Hyundai-Gladstone. Construction costs were $6.3 million at CJDRF and $4.8 million at Hyundai-Gladstone. Exs. 14, 15. At the Hyundai-Gladstone facility, all customer touch points were improved, and the showroom and service areas were updated. *See* Exs. 12, 13. At the CJDRF facility, one showroom was updated, customer touch points were improved, and the office was reconfigured *See* Exs. 10, 11. Square footage at both facilities increased. Exs. 531, 573.

20. In 2016, communications between Gee and the Tonkins broke down when it became evident that they had different understandings of Section 13.2's "Leasehold Improvement Value" exclusion.

21. Plaintiffs hired Kurt Mueller, an experienced commercial real estate appraiser who appraised the properties in 2016, Exs. 16, 18, to appraise CJDRF and Hyundai-Gladstone in 2022. To conduct his appraisal, Muller was provided a copy of the Leases and a spreadsheet of changes and improvements to each dealership. Exs. 533, 535, 536. He also visited the properties.

22. Muller produced his first set of appraisals in August 2022, estimating the hypothetical market value of each property as of May 16, 2022, excluding any leasehold improvements. Muller used a sales comparison approach, which estimated the value of the Premises by comparing it to other comparable sales of auto dealerships. To exclude the value of any leasehold improvements, Muller excluded any capital expenditures and essentially assessed the value of the buildings as though they were still in the same condition as they were in the 2016 appraisals. Using this method, Muller estimated that CJDRF was valued at $16.2 million and Hyundai-Gladstone at $5.9 million. Ex. 7 at 125; Ex. 8 at 124. According to Muller, both properties had appreciated since the Parties signed the Leases.

23. Muller also did an appraisal of Honda-Portland, in which he deducted $40,000 from the estimated value of the dealership for leasehold improvements. These improvements included a new countertop in a restroom, body shop heaters, a resurfaced lot, and an upgraded electrical panel. Ex. 551 at 117.

24. Sampson and Jackson were shocked by the CJDRF and Hyundai-Portland appraisals because they did not capture the millions of dollars spent on each building. Plaintiffs asked Muller to conduct a second appraisal in September 2022 using a "cost approach." Using this approach, Muller assessed the value of each dealership as they existed in May 2022 and deducted the cost of Plaintiffs' capital expenditures dollar-for-dollar. The appraisal for each building was below the floor price set by the terms of the Leases. Exs. 549, 550.

25. Plaintiffs provided the September 2022 appraisals—but not the August 2022 appraisals—to the Tonkins. The Tonkins were stunned at the purchase price assessed by Muller.

26. Defendants hired Thomas Biller, an experienced commercial real estate appraiser, to appraise CJDRF and Hyundai-Gladstone.

7 – FINDINGS OF FACT & CONCLUSIONS OF LAW

27. To conduct his appraisals, Biller was provided with a copy of the Leases and instructions from the Tonkins as to the meaning of Section 13.2. The Tonkins instructed Biller that "Leasehold Improvement Value" is limited to the value of additional square footage. He also visited the properties. Biller's April 2023 appraisals assessed the retrospective market value of the properties as they existed on May 16, 2022, but excluded any value attributable to additional square footage. Using this information and a sales comparison approach, Biller assessed the value of CJDRF at $19.7 million and Hyundai-Gladstone at $9.4 million when adjusted for the additional square footage. Ex. 531 at 60; Ex. 573 at 65.

28. Biller testified at trial that this approach was not consistent with the language of the Leases.

29. Muller's and Biller's appraisals are more than five percent apart.

## CONCLUSIONS OF LAW

**I.  Legal Standards**

A. The Declaratory Judgment Act provides "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration . . . ." 28 U.S.C. § 2201. The Parties seek a declaration as to the meaning of Section 13.2 of the Leases.

B. Under Oregon law, contract construction is a question of law for the court. *Hoffman Const. Co. of Alaska v. Fred S. James & Co. of Or.*, 313 Or. 464, 469, 836 P.2d 703 (1992). The goal of contract construction is to ascertain the parties' intent. *Totten v. N.Y. Life Ins. Co.*, 298 Or. 765, 770, 696 P.2d 1082 (1985).

C. Oregon courts follow a three-step process in interpreting the provisions of a contract. *Yogman v. Parrott*, 325 Or. 358, 361, 937 P.2d 1019 (1997). The first step is to

examine the text of the disputed provision in the context of the document as a whole. *Id*. If the disputed provision is clear within the four corners of the contract, the inquiry ends. *Id*. at 361–63. If the contractual provision is ambiguous, the court generally proceeds to the second step of the interpretation analysis: examining extrinsic evidence of the parties' intent. *Id.* at 363. The court is to pursue the parties' intent if possible. *Id*. at 364 (citing Or. Rev. Stat. § ("ORS") 42.240). If, after considering the relevant extrinsic evidence, the court has not resolved the ambiguity, the court proceeds to the third step of the analysis in which the court relies on appropriate maxims of construction. *Id.*

      D.     A "contractual provision is ambiguous if its wording can, in context, reasonably be given more than one plausible interpretation." *Williams v. RJ Reynolds Tobacco Co*., 351 Or. 368, 379, 271 P.3d 103 (2011); *see also Edwards v. Merle West Med. Ctr*., 147 Or. App. 71, 77, 935 P.2d 442 (1997) ("A contract provision is ambiguous if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation; it is unambiguous if its meaning is so clear as to preclude doubt by a reasonable person."). "Whether terms of a contract are ambiguous is a question of law." *Yogman*, 325 Or. at 361 (internal quotation marks and citation omitted).

      E.     The parol evidence rule "bars evidence of prior written or oral agreements offered to supplement or contradict a completely integrated agreement." *Blackthorne v. Posner*, 883 F. Supp. 1443, 1450 (D. Or. 1995) (citing *Abercrombie v. Hayden Corp.*, 320 Or. 279, 288, 883 P.2d 845 (1994)); *see also Berger v. Stephan,* 241 Or. App. 399, 410, 250 P.3d 954 (2011) (Under the parol evidence rule, "all oral negotiations or stipulations between the parties preceding or accompanying the execution of the written contract are regarded as merged in it." (internal citation, brackets, and quotations omitted)).

9 – FINDINGS OF FACT & CONCLUSIONS OF LAW

      F.     "The effect of the [parol evidence] rule is that, as between the parties to a contract that is complete in itself and fully integrated, there is a conclusive presumption that the agreement is the embodiment of the terms of their undertaking." *Berger*, 241 Or. App. at 410. "[W]hether an agreement is completely integrated is a question of fact for the court that is answered by the objective intent of the parties." *Blackthorne*, 883 F.Supp. at 1450.

      G.     In Oregon, the parol evidence rule is codified at ORS 41.740:

> When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However, this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term "agreement" includes deeds and wills as well as contracts between parties.

*See also Abercrombie*, 320 Or. at 286 (finding the statute is "a codification of the common law parol evidence rule").

      H.     Thus, except under specific circumstances, Oregon law bars the use of extrinsic evidence in interpreting a fully integrated agreement. One such exception relevant to this case is extrinsic evidence of the circumstances under which the agreement was made under ORS 42.220. *See also Webb v. Nat'l Union Fire Ins. Co.*, 207 F.3d 579, 582 n.1 (9th 2000) (acknowledging that Oregon courts also "consider the circumstances surrounding the formation of a contract" under ORS 42.220); *Fogg v. Wart*, No. CV-06-160-ST, 2006 WL 3716745, at *6–7 (D. Or. Dec. 14, 2006) (reconciling *Webb* and Oregon appellate decisions and finding that the district court "may examine extrinsic evidence limited to the circumstances under which the contract was made").

10 – FINDINGS OF FACT & CONCLUSIONS OF LAW

I.  Under ORS 42.220, "[i]n construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting." The Oregon Court of Appeals has concluded that past dealings, prior drafts of the agreements, precontract negotiations, and statements by one party to another constitute circumstances under which an agreement was made. *See Batzer Const., Inc. v. Boyer*, 204 Or. App. 309, 319–20, 129 P.3d 773 (2006).

## II. Plaintiffs' Motions in Limine

J.  The Court grants in part and denies in part Plaintiffs' first motion in limine. Pls.' Mot. Limine, ECF No. 44. Plaintiffs' first motion seeks to exclude evidence or testimony under the parol evidence rule. But none of the extrinsic evidence submitted by the Parties and considered by this Court is improper parol evidence. The Parties' communicated intent to ensure Plaintiffs did not have to pay twice for any improvements made during the lease term is evidence of the circumstances under which the Leases were made under ORS 42.220 and is, therefore, admissible and relevant to the Court's analysis.

K.  To the extent that Plaintiffs seek to exclude evidence of the Parties' uncommunicated subjective intent, the Court grants the motion. Regardless of whether it is barred by the parol evidence rule, that evidence is irrelevant. *Apeldyn Corp. v. Eidos, LLC,* 943 F. Supp. 2d 1145, 1149 (D. Or. 2013) ("Statements of a party's subjective intent that were not expressed or communicated at the time the contract was formed are not permissible evidence of intent.").

L.  To the extent Plaintiffs seek to exclude extrinsic evidence of the Parties' intent or understanding of the Leases after their date of execution, this evidence is not barred by the parol

11 – FINDINGS OF FACT & CONCLUSIONS OF LAW

evidence rule, but it is irrelevant to the Court's interpretation of this unambiguous, fully integrated agreement. *See Abercrombie*, 320 Or. at 292 n.12.

    M.    The Court grants Plaintiffs' second motion in limine. Plaintiffs' second motion in limine seeks to exclude evidence concerning Plaintiffs' receipt of manufacturer incentives, reimbursements, or vehicle allocations. Generally, evidence that the Parties discussed and understood upgrades would be required by manufacturers is relevant to the circumstances under which the Parties entered the Leases. But the actual receipt of such reimbursements or compensation from manufacturers is not relevant to this Court's analysis given the terms of the Leases, as described below. *See* Exs. 517, 522, 566, 567, 572.

### III.    Interpretation of Section 13.2

    N.    The Leases constitute fully integrated written agreements. Exs. 1, 2 at § 18.6.

    O.    Taking into consideration the plain language and context of Section 13.2 within the four corners of the Leases along with the circumstances under which the Leases were made, the Court finds the disputed terms of the contract are unambiguous.

    P.    Section 13.2 provides:

> The Purchase Price shall not include the value of any leasehold improvements or additions to the Premises constructed or installed by Tenant at its sole cost and expense ("the Leasehold Improvement Value"). The Leasehold Improvement Value shall not, however, include the cost or value of replacements of existing components of the Premises.

Exs. 1, 2.

    Q.    As used in Section 13.2, "Leasehold Improvement Value" means the value added to the Premises by any additions to the Premises or any beneficial change to the Premises by or for the benefit of Plaintiffs. It does not include "replacements of existing components," which are replacements due to regular building maintenance, wear-and-tear, or damage to the Premises.

12 – FINDINGS OF FACT & CONCLUSIONS OF LAW

R. These definitions are supported by the circumstances under which the Leases were made. Based on the language of the Leases, the Court finds the Parties intended for Defendants to ultimately sell the properties to Plaintiffs. They included Sections 13 and 14 of the Leases to allow either Defendants or Plaintiffs to force the sale of each property over a ten-year period.  The Parties knew that upgrades of CJDRF and Hyundai-Portland were imminent, and Plaintiffs did not want to pay twice for these improvements when they ultimately purchased the real estate from Defendants. This was discussed by Gee and Sampson before the Parties signed the Leases.

S. The Parties exchanged drafts of the language in Section 13.2, but their edits do not provide any additional context beyond the circumstances described above.

T. The definition is also supported by the text and context of Section 13.2. Black's Law Dictionary defines "Leasehold Improvements" as "[b]eneficial changes to leased property (such as a parking lot or driveway) made by or for the benefit of the lessee." *Leasehold Improvements, Black's Law Dictionary* (12th ed. 2024). "Addition" is defined by Webster's New International Dictionary as "a part joined or added with a building to increase available space." *Addition*, *Webster's Third New Int'l Dictionary* (2002).

U. Webster's defines "replacement" as "something that replaces" such as "a new fixed asset or portion of an asset that takes the place of a discarded one." *Replacement*, *Webster's Third New Int'l Dictionary* (2002). And an analogous term—"replacement cost"—is defined by Black's as: "The cost of a substitute asset that is equivalent to an asset currently held. The new

asset has the same utility but may or may not be identical to the one replaced." *Cost*, *Black's Law Dictionary* (12th ed. 2024).[4]

  V. Sections 6.4 and 6.5 bolster the Court's interpretation of Section 13.2. Section 6.4 provides that Plaintiffs are responsible for maintaining the Premises in good order, condition, and repair and obligates Plaintiffs to replace any part of the Premises that cannot be fully repaired or restored even where the benefit of the replacement extends beyond the Lease term. Exs. 1, 2. It also requires Plaintiffs to repair any damage to the premises. Exs. 1, 2. By contrast, Section 6.5 covers "alterations, additions, and improvements," and provides that Defendants cannot unreasonably withhold, condition, or delay consent for additions or improvements imposed by a manufacturer. Exs. 1, 2. Thus, in context, replacements refer to changes to the Premises for the benefit of the landlord as part of required maintenance, regular wear-and-tear, or repairs to the Premises. Additions or improvements, by contrast, are contemplated as changes made for the benefit of Plaintiffs, including those required by car manufacturers.

  W. Defendants' argument that "sole cost and expense" excludes any improvements for which Plaintiffs received manufacturer incentives is inconsistent with the text and context of Section 13.2. Given language throughout the Leases describing the financial obligations of the tenant and landlord, "sole cost and expense" as used in Section 13.2 means Plaintiffs did not receive any financial assistance from Defendants. Exs. 1, 2 at §§ 6.4, 7 (describing the landlord's

---

[4] Under Oregon law, "[t]he terms of a writing are presumed to have been used in their primary and general acceptance . . . ." ORS 42.250. The court determines whether words have a plain meaning by "reference to the usual source of ordinary meaning, the dictionary." *Phillips v. State Farm Fire & Cas. Co.*, 302 Or. App. 500, 506, 461 P.3d 1008 (2020). The court can also take judicial notice of the meaning of words, phrases, and legal expressions through comprehensive standard dictionaries. *See Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*, 881 F.2d 801, 803 (9th Cir. 1981) (citing Federal Rule of Evidence 201 and using Webster's Third New International Dictionary to ascertain the meaning of two words in a statute).

14 – FINDINGS OF FACT & CONCLUSIONS OF LAW

and tenant's responsibilities for maintenance and in the event of damage to the Premises). Further, given the prevalence of manufacturer incentives in the car industry, Defendants reading would all but render meaningless the leasehold improvement exclusion. *See* ORS 42.230 ("In the construction of an instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, . . . and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all.").

## IV.   Application of Section 13.2

X.   None of the Parties' 2022 and 2023 appraisals is consistent with the Court's interpretation of Section 13.2 above.

Y.   Biller's appraisals are not consistent with the text of Section 13.2. Specifically, Defendants' proposed construction—that Leasehold Improvement Value is limited to the value of additional square footage—is not supported by the text of Leases. The text of the Leases refers to "additions *or* improvements" that are "constructed or installed." Exs. 1, 2 at § 13.2 (emphasis added). Defendants' reading would render meaningless the word "improvement." Biller confirmed this inconsistency between Defendants' approach and the language of the Leases in his testimony.

Z.   Muller's September appraisals are inconsistent with the plain language of Section 13.2. In the September appraisals, Muller deducted the *cost* of Plaintiffs' improvements from the estimated purchase price of the Premises. But the text of Section 13.2 only allows Plaintiffs to exclude the *value* of the improvements. *See* Exs. 1, 2 at § 13.2 ("The Purchase Price shall not include the value of any leasehold improvements . . . .").

AA.   Muller's August appraisals are also not consistent with Section 13.2. Muller testified that he considered all capital expenditures to be leasehold improvements. But this paints

15 – FINDINGS OF FACT & CONCLUSIONS OF LAW

too broad a brush. As Defendants illustrated through the Honda-Portland appraisal—where Plaintiffs sought to exclude the value of a new electrical panel, new body shop heaters, the cost of resurfacing a lot, and a new bathroom countertop, Ex. 551 at 117—there is not sufficient information to determine whether changes were appropriately categorized as improvements instead of replacements.

BB. The Court finds Plaintiffs' argument that the Court cannot interpret the meaning of the term "Leasehold Improvement Value" unpersuasive. Pursuant to the terms of the Leases and Oregon law, the Court has the power to resolve disputes arising out of the Leases and to interpret the terms of the Leases. Exs. 1, 2 at §§ 17, 18.10; *Hoffman*, 313 Or. at 469 (holding contract construction is a question of law for the court).

CC. The Court, however, declines to determine what specific changes are improvements or replacements. The application of these terms is highly fact-intensive and falls within the expertise of the appraiser. *See* Exs. 1, 2 at § 13.2 (directing the appraisers to assess the Purchase Price of the premises).

DD. Pursuant to Section 13.2, where the Parties cannot agree on a purchase price, Plaintiffs and Defendants must appoint a real estate appraiser to appraise the fair-market value of the Premises as of the date of the Option or Put. Using the Leases and this Court's definitions described above, the appraiser must identify the improvements and additions to the Premises and ascertain their value. Then, the appraiser must use their expertise to appraise the Premises and calculate their Purchase Price, which is the fair market value of the Premises excluding any increase in value attributable to Plaintiffs' improvements or additions. If the appraisals are more than five percent apart, the two initial appraisers shall select a third appraiser meeting the qualifications described in Section 13.2. The third appraiser should also appraise the Premises as

described above, without any review of the appraisals conducted by the Plaintiffs or Defendants pursuant to Section 13.2 until after the third appraisal is complete. Because the 2022 and 2023 appraisals did not comply with this process, the Parties must begin again with their own independent appraisals before they proceed to a third appraisal.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

17 – FINDINGS OF FACT & CONCLUSIONS OF LAW

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Plaintiffs' claim for a declaratory judgment as to the CJDRF and Hyundai-Portland Leases. The Court GRANTS IN PART and DENIES IN PART Defendants' first and second counterclaims for a declaratory judgment as to the CJDRF and Hyundai-Portland Leases. The Court also GRANTS IN PART and DENIES IN PART Plaintiffs' Motions in Limine [44]. Pursuant to representations made by the Parties during trial, the Court dismisses the Parties' claims and counterclaims for declaratory relief as to the Honda-Portland property and the 2023 exercise of the Option/Put provisions of the Leases.

The Court declares as follows: "Leasehold Improvement Value" is the value added to the Premises by any additions to the Premises or any beneficial change to the Premises by or for the benefit of Plaintiffs. It does not include "replacements of existing components," which are replacements due to regular maintenance, wear-and-tear, and damage to the Premises. The 2022 and 2023 appraisals completed by Muller and Biller are inconsistent with the Court's definition of "Leasehold Improvement Value" as described in the Court's Findings of Fact & Conclusions of Law. The Parties shall proceed with new appraisals of CJDRF and Hyundai-Gladstone using the procedures identified in Section 13.2 of the Leases with instructions to the chosen appraisers to apply Section 13.2 consistent with this decision.

The Parties shall file a joint proposed judgment within 14 days of this Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.

DATED this 26th day of February, 2025

*Amy M. Baggio*
_____
AMY M. BAGGIO
United States District Judge